IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jonathan Charles Porter,      ) | Civil Action No. 6:08-2352-MBS-WMC |
| Plaintiff,   ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs.   ) | |
| ) | |
| Michael J. Astrue,   ) | |
| Commissioner of Social Security,   ) | |
| ) | |
| Defendant.   ) | |
| _____ ) | |

      This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security that he is no longer disabled and, therefore, ineligible for supplemental security income benefits under Title XVI of the Social Security Act, and not entitled to child's disability benefits, under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

      The plaintiff previously received supplemental security income (SSI) benefits under Title XVI of the Act based on childhood disability.  When he turned 18 in September 2003, his disability status was reevaluated, and on March 8, 2004, the Commissioner

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

concluded he was not considered disabled under the adult disability rules, effective March 1, 2004. This decision was upheld on reconsideration, and on February 18, 2005, the plaintiff requested a hearing.

Prior to the hearing, on March 29, 2007, the plaintiff filed an application for Title II child's insurance benefits (as a disabled adult child) on the earnings record of his deceased father. As with SSI for adults, Title II benefits for disabled adult children of insured wage earners are awarded under the disability rules for adults, and the plaintiff's current disability must have begun prior to age 22. On May 18, 2007, an administrative law judge (ALJ) conducted a hearing at which he considered the merits of both the Title XVI redetermination and the Title II application. Present at the hearing were the plaintiff, his attorney, his mother (as a witness) and a vocational expert. On September 15, 2007, the ALJ determined that the plaintiff had not been disabled at any time between March 1, 2004, and the date of the ALJ's decision (which was issued a few days after the plaintiff's 22nd birthday). Therefore, he determined that the plaintiff was ineligible to receive benefits under Title II or Title XVI. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on April 23, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant attained age 18 on September 12, 2003 and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18. The claimant was notified that he was found no longer disabled as of March 1, 2004, based on a redetermination of disability under the rules for adults who file new applications.

> (2)    The claimant will attain the age of 22 on September 12, 2007, the day before his 22nd birthday (20 CFR 404.102).

2

(3)   The claimant has not engaged in substantial gainful activity since January 1, 2000, the alleged onset date (20 CFR 404.1520(b), 404.1571, 416.920(b) and 416.961 *et seq.*).

(3) [sic] Since March 1, 2004, the claimant has had the following severe combination of impairments: Post-Traumatic Stress Disorder; Panic Disorder; Social Phobias; and Depression (20 CFR 404.1520(c) and 416.920(c)).

(4)   Since March 1, 2004, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)   After careful consideration of the entire record, the undersigned finds that, since March 1, 2004, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he would be limited to performing simple, routine, repetitive tasks, which he could perform for at least two hour periods.

(6)   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

(7)   The claimant is a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

(8)   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

(10)   Since March 1, 2004, and prior to attaining age 22, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

(11)   The claimant's disability ended on March 1, 2004, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

(12)   The claimant was not under a disability as defined in the Social Security Act, at any time through the date of this

decision, pursuant to section 223(d) of the Social Security Act (20 CFR 404.350(a)(5) and 404.1520(g)). Eligibility for child's insurance benefits must be established prior to the attainment of age 22.

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

4

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

5

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff, who was born in 1985, initially received SSI on the basis of mental retardation[2] and anxiety-related disorders (Tr. 37). He attended school through eighth grade with some special education assistance and some home instruction (Tr. 120-55, 308-09, 317-18). He has no work history.

### Evidence Prior to the March 2004 SSI Redetermination

The record indicates that, as a young child, the plaintiff was physically and emotionally abused by his stepmother (Tr. 99-100, 257). Subsequently, he was diagnosed with social phobia, intermittent explosive disorder, posttraumatic stress disorder (PTSD), panic disorder with agoraphobia, a depressive disorder, generalized anxiety disorder, reading difficulties, and mild mental retardation (Tr. 120-63, 174-200). He also had low back pain that was related to muscle spasms (spastic dystonia) and/or "mild" to "moderate" degenerative changes in the lumbar spine without neural compromise, including "mild" bulging lumbar discs causing "no significant mass effect" (Tr. 185, *see also* Tr. 120-63, 174-200).

---

[2]IQ tests administered in 1993 and 1996, when the plaintiff was seven and ten years old, respectively indicated intellectual functioning in the low average to average range, with IQ scores between 80 and 102 (Tr. 121, 141). However, an IQ test administered in 2001, when the plaintiff was 15 years old, revealed IQ scores between 60 and 70, which fell in the mild mental retardation range (Tr. 162). The psychologist who administered the 2001 IQ test opined that the variability in the plaintiff's scores was "due to his considerable emotional difficulties" (Tr. 163).

Beginning in April 2003 and continuing until approximately February 2007, the plaintiff received vocational rehabilitation services (Tr. 289-91).

In July 2003, when the plaintiff was 18 years old but still receiving benefits under the child disability rules pending redetermination of his claim, treating neurologist/ psychiatrist Dr. F. Antonio Amaya opined that "exacerbations of [plaintiff's conditions] can completely interfere with [his] ability to function 'mentally' and 'physically,' rendering him unemployable" (Tr. 186).

The plaintiff was involved in a car accident in November 2003, and complained of back pain. Subsequent records indicated that the accident caused bulging discs, but the plaintiff already had pre-existing "mild" bulging discs (Tr. 185), and the record contains no MRI or x-ray reports dated during or after November 2003 that would indicate any new problems (Tr. 108, 175, 213, 222).

In February 2004, the plaintiff underwent a consultative psychological evaluation by Spurgeon N. Cole, Ph.D., in connection with the SSI redetermination (Tr. 256-59). Dr. Cole noted that the plaintiff was attending an alternative school in an effort to obtain his high school graduation equivalence diploma (GED), but that he did not have a driver's license. He observed that the plaintiff walked unassisted with a satisfactory gait and appeared to be in good health. Dr. Cole noted, however, that the plaintiff was possibly over-medicated from narcotic pain medication. During the evaluation, the plaintiff was initially ill at ease, but relaxed as it proceeded, although he demonstrated limited social skills and appeared anxious. He had a mildly constricted affect and did not appear unduly depressed. He was alert and lucid, but had somewhat slurred speech due to his medications. His responses were well-formulated, and he was able to establish rapport with Dr. Cole. Dr. Cole noted that the plaintiff's vocabulary and speech suggested "near average" cognitive ability, that he had no difficulty carrying on a meaningful conversation, that he had intact memory, and that he had some "unusual mannerisms" but was not

7

psychotic.  As to activities, the plaintiff reported that he attended school four days per week, attended church once a month, visited with cousins, previously had a girlfriend but had no male friends, watched television, went shopping and out to eat occasionally, went to the mall with people he knew (although he was anxious in social situations), and played baseball and football with cousins at times, but usually spent his time at home with his mother.  The plaintiff indicated that he felt shaky and had "some panic attacks, but generally [they happened when he was] around strangers or in crowds."  Dr. Cole noted that the plaintiff interacted with students adequately at school.  Dr. Cole's examination findings indicated that the plaintiff was alert, had coherent speech and logical thought processes, could think in abstract terms without great difficulty, and could concentrate adequately.  An IQ test revealed "low average" intellectual functioning, with a verbal IQ of 85, performance IQ of 76, and full scale IQ of 80.  He performed math at the sixth-grade level and read at the third-grade level.  Dr. Cole concluded that the plaintiff had generalized anxiety disorder of "moderate" severity, and possibly sciophobia (a fear of something that poses no actual threat) of "moderate" severity (Tr. 256-59).

In February 2004, a State agency physician reviewed the plaintiff's medical records in connection with the SSI redetermination and concluded that while the plaintiff had "severe"[3] anxiety, he did not have a severe physical impairment.  The physician stated that "[r]eview of physical evidence fails to satisfactorily confirm the presence of physical impairments which would significantly reduce [the] capacity for work" (Tr. 280).

**Evidence During the Unadjudicated Period (March 2004-September 2007)**

In early March 2004, State agency psychologist Renukar Harper, Ph.D., reviewed the plaintiff's medical records and determined that his affective and anxiety

---

[3]A "severe" impairment is one which significantly limits the ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).

disorders produced "mild" restriction in daily activities; "moderate" difficulties in social functioning, concentration, persistence and pace; and no episodes of decompensation. He considered Dr. Amaya's earlier opinion and concluded that, "[b]ased on objective mental status findings, [plaintiff's symptoms] are severe but would not preclude the performance of simple routine work activities." When assessing the plaintiff's specific mental limitations, Dr. Harper found he was "not significantly limited" in 16 of 20 categories of basic mental work activities, with the only exceptions being "moderate" limitations in understanding and remembering detailed instructions, "moderate" limitations in carrying out detailed instructions, "marked" limitations in interacting with the general public, and "moderate" limitations in setting goals independently (Tr. 270-75). Subsequently, a second State agency psychological consultant concurred with Dr. Harper's assessment (Tr. 276).

In late March 2004, the plaintiff sought emergency room treatment for muscular back and left arm pain after a physical therapy session. He received narcotic pain medication (Tr. 201-06).

In April 2004, the plaintiff presented to psychiatrist Dr. Jacqueline Mouzon for an initial evaluation. Dr. Mouzon noted that the plaintiff had never been hospitalized for his psychiatric problems. The plaintiff reported having no friends and worrying about people judging him. A mental status examination showed he was alert and attentive, fully oriented, had normal speech with some slurring of words, and had logical, goal-directed thought processes. Dr. Mouzon prescribed an antidepressant (Tr. 246-47).

In June 2004, the plaintiff told Dr. Mouzon that Dr. Amaya had given him a medication for "constant" panic attacks. Upon mental status examination, the plaintiff had an "ok" mood, appropriate affect, and goal-directed thought processes, and was alert and oriented (Tr. 255). Dr. Mouzon continued his medications (Tr. 255).

The plaintiff sought emergency care for back pain and narcotic withdrawal after he ran out of medication in July 2004 (Tr. 207-25). He was referred to a detoxification

clinic with a plan to taper off his use of narcotics (Tr. 209, 222). During the brief hospitalization, he reported that he was trying to obtain his GED. His mother said he was "very functional at home with his medication" (Tr. 214). At a subsequent appointment with Dr. Mouzon, the plaintiff reported that he was on a tapering dose of one narcotic and completely off another narcotic and that, with regard to activities, he "enjoy[ed] cooking" (Tr. 253).

In August 2004, the plaintiff sought emergency care three times for back pain (Tr. 227-35). While he had some paralumbar tenderness, there was no evidence of trauma or spasms, straight leg raising tests for signs of nerve irritation were negative, and he was neurologically intact (Tr. 228, 231-32, 235). At the second visit, an attending physician spoke with the plaintiff's mother and learned that the plaintiff had recently discovered his grandmother dead in her home. The physician stated, "I feel like, in further talking with them, a large portion of [plaintiff's] symptoms are related to anxiety and depression along with social phobia." The physician instructed the plaintiff to take an antidepressant and avoid narcotics, and the plaintiff received anti-inflammatory medication for his pain (Tr. 232-35).

In September 2004, the plaintiff returned to the emergency department and reported increasing pain after "lifting a horse fence three times." Examination of his back revealed some muscle pain with palpation, but no specific point tenderness (Tr. 238).

Also that month, the plaintiff reported to Dr. Mouzon that he was going to "move into his own place in about a year." His mood was "pretty good" and he exhibited a normal affect, thought processes and cognition, with fair insight and judgment (Tr. 252).

In questionnaires completed in November 2004 in connection with his claims for benefits, the plaintiff reported that his hobbies including watching movies, going to school, hunting, fishing, and drawing. He reported that he loved to go to church, but did not

talk to people.  He indicated that he intended to obtain his GED and enter law enforcement (Tr. 117-18).

In December 2004, a State agency physician reviewed the plaintiff's medical records and concluded that while the plaintiff had "severe" mental impairments, he did not have a "severe" physical impairment, noting that there was "[n]o significant objective clinical or imaging abnormality" (Tr. 283).

The record contains no evidence of medical treatment between December 2004 and February 2006.

In February 2006, the plaintiff tested positive for Hepatitis C.  At related appointments with Dr. David T. Wortham in June and August 2006, the plaintiff denied having any Hepatitis C symptoms (Tr. 298-99).

Between October 2006 and January 2007, the plaintiff attended therapy with psychologist David Cannon, Ph.D.  Dr. Cannon's notes indicated that the plaintiff had anxiety and panic attacks, was an "approval addict," was "addicted to video games," had recently opened a checking account, and planned to start school at Tri County Tech. Although the plaintiff's father had recently died from a heart attack, the plaintiff's affect was "generally broad" and his mood "unremarkable."  His anxiety level seemed somewhat lower (Tr. 293-94).

In January 2007, Dr. Wortham reported that the plaintiff had not started Hepatitis C treatment (which was expected to aggravate his depression) and that he "seem[ed] to be doing o.k." (Tr. 297).

In February 2007, Dr. Hunter Woodall wrote a letter stating that the plaintiff "should be considered for disability due to severe depression and chronic [H]epatitis C infection" (Tr. 285).

Also in February 2007, Dr. Joseph McElwee wrote a letter stating that he had conducted a psychiatric evaluation at Dr. Woodall's request, that treatment for Hepatitis C

11

could exacerbate psychiatric disorders, that the plaintiff was seeing a psychologist to address his social anxiety, and that he had "very limited social skills, and [was] limited in his social interactions" (Tr. 287).

A vocational rehabilitation note – completed by an unspecified source on an unspecified date – indicated that the plaintiff would be attending an upcoming disability hearing, and that he was "not able to work at this time due to extensive physical problems" (Tr. 291).

In March 2007, Dr. Cannon wrote a letter stating that the plaintiff had a severe panic disorder and social phobias, along with "intermittent" depression. Dr. Cannon opined that "[h]is psychological conditions appear to significantly interfere with his daily functioning at this time" (Tr. 292).

The same month, Dr. Wortham noted that the plaintiff had performed CPR after his father's ultimately fatal heart attack, and was "still working through that" emotionally. They discussed starting treatment for Hepatitis C sometime in the future (Tr. 295-96).

### Hearing Testimony

At the administrative hearing in May 2007, the plaintiff testified that during vocational rehabilitation, he worked briefly as a drill bit assembler (Tr. 309-10), but did not complete vocational rehabilitation in part due to back problems and in part so that he could attend an alternative school to obtain his GED (Tr. 316). He testified, however, that he did not finish the GED program because "a lot of stuff just hit us all at once" and because he had to care for his depressed mother for about a year (Tr. 318-19). He testified that he failed his driver's license test several times (Tr. 313).

The plaintiff testified that he had panic attacks when he was "around a crowd of people" and that they occurred as often as three times a week or more (Tr. 320-21). He

also testified that he had panic attacks at home (Tr. 321).  He testified that he did household chores at a slow pace, when he felt able to do them at all (Tr. 325).  He testified that his anxiety medication helped his panic attacks somewhat, but that he still had them (Tr. 326).  He reported difficulty concentrating (Tr. 326-27).  The plaintiff also testified that his back pain was caused by "three crushed dis[c]s" (Tr. 327).  He reported having sharp pain when lifting something "pretty heavy" (Tr. 327).  He indicated that he could sit 30 minutes at a time (sometimes longer), and stand 45 minutes at a time (Tr. 323).  He also reported that his Hepatitis C "mentally put a strain on [him]" because he was afraid to get close to people (Tr. 329).

As to a typical day, the plaintiff testified that he ate, watched television, took his dogs for a short walk, used a computer to "check [web]sites," talked to his sister, and went back to sleep (Tr. 331).  He testified that he helped prepare meals and shop for groceries (Tr. 332).  He also testified that he played video games, went to church sometimes, hunted deer and turkey (though he had not been successful recently), and fished (Tr. 335).

The plaintiff's mother, Teresa Porter, testified that the plaintiff had been traumatized by the recent deaths of his grandmother and his father (Tr. 340).  She generally corroborated his complaints (Tr. 340-43).

Vocational expert Karl S. Rock Weldon testified that a hypothetical individual of the plaintiff's age, education and experience, who had no exertional limitations and could perform "simple, routine work activities, such as unskilled work" for two-hour periods, could perform the representative jobs of hand packager (light, unskilled, 2,800 jobs in upstate South Carolina and 267,000 jobs nationwide); and bagger-type occupations (medium, unskilled, 1,900 jobs in upstate South Carolina and 310,000 jobs nationwide) (Tr. 344-45).[4]

---

[4]*See* 20 C.F.R. §§ 404.1567(b), (c) (definitions of light and medium work); 404.1568(a) (definition of unskilled work).

He clarified that these were "simple unskilled occupations" (Tr. 345). When questioned by the plaintiff's counsel, Mr. Weldon testified that a hypothetical individual with the additional limitations of no constant interaction with the public and only low-stress or low-production work could not perform any jobs (Tr. 346).

## ANALYSIS

The plaintiff, who was born in 1985, initially received SSI on the basis of mental retardation and anxiety-related disorders. He attended school through 8th grade with some special education assistance and some home instruction. He has no work history. The issue before the ALJ was whether the plaintiff was disabled after March 1, 2004. The plaintiff alleges disability due to post-traumatic stress disorder, panic disorder, social phobias, and depression. The ALJ found that the plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: he would be limited to performing simple, routine, repetitive tasks, which he could perform for at least two hour periods. The plaintiff argues that the ALJ erred by (1) failing to properly assess his credibility; (2) failing to properly consider the opinions of his treating physicians; and (3) finding that he could perform the jobs of hand packager and bagger.

### *Credibility*

The plaintiff argues that the ALJ failed to properly assess his credibility. A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Further-more, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's

credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

In his testimony before the ALJ at the hearing on May 18, 2007, the plaintiff testified regarding his primary severe limitations of post-traumatic stress disorder, panic disorder, social phobia, and depression.  The plaintiff was then asked by his attorney about "problems with his back" (Tr. 327).  In response to this question, the plaintiff said "I have three, three crushed discs in my back" (Tr. 327).  The plaintiff then answered follow-up

questions from his attorney related to his back pain, outlining his understanding of the problem ("the doctor told me that's what had caused my spine to be crushed like it is"); how severe the pain is ("it shoots like lightning down through my legs"); and the limitations this back pain causes him ("I can't stand very long because – because it's like maybe 45 minutes and then my back just kind, kind of wants to collapse") (Tr. 327-28).  When the plaintiff's attorney finished directly questioning him, the ALJ asked the plaintiff questions, but did not ask the plaintiff anything about his back or his statement about his "crushed discs" (Tr. 331-37).  In the written decision, the ALJ concluded that the plaintiff's testimony regarding his back problems was "not entirely credible" because imaging studies did not support his allegation of "three crushed discs" (Tr. 28).

Also in the credibility analysis, the ALJ stated that the plaintiff's "testimony regarding the extent of his mental limitations is not fully supported by the record" (Tr. 28).  The ALJ further stated:  "The claimant states that he has a learning disability, and while he clearly does have educational limitations, it is noted that he has shown a good vocabulary both during consultative evaluations and during the hearing" (Tr. 28).

The plaintiff argues that the ALJ's focus on his characterizations of the source of his back pain and his learning difficulties is misplaced.  He was 21 years old at the time of the hearing.  He has a very limited sophistication level, very limited life experiences, and he went to school only through the 8th grade (Tr. 18-19).  The plaintiff's full-scale IQ was tested at 63 (Tr. 19).  The plaintiff has long-demonstrated anxiety issues and social phobias, and he was testifying in the nervous setting of a hearing before a judge.  When he was asked about his back problems, he stated what he understood to be the problem with his back from what, as he testified, his doctor had told him ("the doctor told me that's what had caused my spine to be crushed like it is") (Tr. 327).  Further, it is understandable that the plaintiff would believe and testify that he has a learning disability given that he attended school only through the 8th grade, he was in special  education classes in every

subject except math, he has very limited ability to read or write, and he was sent by the school to homebound and alternative education services.  There is no dispute that the plaintiff has had profound difficulty in a classroom setting, as both the plaintiff and his mother testified to in great detail.

This court agrees with the plaintiff that his characterization of his back issues and difficulty with school and learning should not have been the focus of the ALJ's credibility analysis.  Upon remand, the ALJ should be directed to reconsider the plaintiff's credibility in accordance with the above-cited law.

### Treating Physicians

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in

17

which he is rendering an opinion.  20 C.F.R. §404.1527(d)(2)-(5).  Social Security Ruling

96-2p requires that an ALJ give specific reasons for the weight given to a treating

physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security

Ruling 96-2p:

> A finding that a treating source medical opinion is not well
> supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the opinion
> should be rejected.  Treating source medical opinions are still
> entitled to deference and must be weighed using all of the
> factors provided in 20 C.F.R. 404.1527 and 416.927.  In many
> cases, a treating source's opinion will be entitled to the greatest
> weight and should be adopted, even if it does not meet the test
> for controlling weight.

*Id.* 1996 WL 374188, *4.

In April 2001, Dr. Cannon found that the plaintiff had a full-scale IQ of 63,

which is in the mild mentally retarded range (Tr. 162).  In March 2007, Dr. Cannon opined

that the plaintiff's panic disorder and social phobias were severe.  He further stated that the

plaintiff suffered from intermittent depression and "his psychological conditions appear to

significantly interfere with his daily functioning at this time" (Tr. 292 ).  In July 2003,  treating

neurologist/ psychiatrist Dr. Amaya opined that "exacerbations of [plaintiff's conditions] can

completely interfere with [his] ability to function 'mentally' and 'physically,' rendering him

unemployable" (Tr. 186).  In February 2004, Dr. Cole indicated that the plaintiff performed

math at the 6th grade level and read at the 3rd grade level.  Dr. Cole concluded that the

plaintiff had generalized anxiety disorder of "moderate" severity and possibly sciophobia (a

fear of something that poses no actual threat) of "moderate" severity.  Dr. Cole further noted

that the plaintiff did not exaggerate his difficulties (Tr. 256-59).  In April 2004, Dr. Mouzon

diagnosed the plaintiff with post-traumatic stress disorder, social phobia, and assigned him

18

a Global Assessment of Functioning ("GAF") score of 50[5] (Tr. 246).  In February 2007, Dr. Hunter Woodall wrote a letter stating that the plaintiff "should be considered for disability due to severe depression and chronic [H]epatitis C infection" (Tr. 285).  Also in February 2007, Dr. Joseph McElwee noted that Dr. Woodall had referred the plaintiff to him for a psychiatric evaluation in 2006.  He stated that the plaintiff's treatment for Hepatitis C could exacerbate his psychiatric disorders (learning disorder and severe social anxiety disorder).  Dr. McElwee opined that the plaintiff would need increased psychiatric follow-up during his treatment for Hepatitis C (Tr. 287).

The ALJ found that the opinion of Dr. Woodall was "on an issue reserved to the Commissioner."  He further stated that "[t]he opinion of Dr. McElwee that the claimant is limited in his social skills and social interactions has been considered, but it is noted that the preponderance of the evidence does not support a finding that the claimant is so limited in his social skills that he would be unable to sustain appropriate interaction with peers and co-workers."   The ALJ found that "[t]he opinion of Dr. Cannon that the claimant's psychological conditions significantly interfere with his daily functioning is a non-specific finding; however, Dr. Cannon's treatment notes indicate that the claimant was not overtly depressed, and his anxiety level had improved as of the claimant's last visit on May 12, 2007."  The ALJ went on to find that Dr. Cannon's treatment notes did not support a finding that the claimant's mental limitations were severe as characterized in his March 2007 statement.  The ALJ further found that the plaintiff's "mental impairments are not as limiting as was found by the State Agency psychologist" as "[t]here is no evidence at this time to suggest that the claimant should be limited to low stress, low production work, or that he should avoid constant interaction with the general public" (Tr. 29).

---

[5]A GAF code between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV*), 32 (4th ed. 1994).

This court agrees with the plaintiff that the ALJ failed to properly consider the opinions of his treating physicians.  Even if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying the above-cited factors.  Upon remand, the ALJ should be instructed to reconsider the multiple opinions of the plaintiff's treating physicians, as well as the opinions of the examining physicians and State Agency medical consultants, in accordance with the above-cited law.

### Vocational Expert

The plaintiff next argues that the ALJ erred in finding that he can perform a significant number of jobs in the national economy, and specifically the occupations of bagger and hand packager (*see* Tr. 30).  The plaintiff argues that these jobs require interaction with the public, and substantial evidence does not show that he is capable of such interaction.  The ALJ stated in his written decision that "due to his social phobias and panic attacks, [the plaintiff] would need to avoid constant public interaction" (Tr. 16).  However, later in the opinion, the ALJ stated, "[t]here is no evidence at this time to suggest that the claimant should be limited to low stress, low production work, or that he should avoid constant interaction with the general public" (Tr. 29).  Clearly these two statements by the ALJ directly contradict each other.

The defendant concedes that the ALJ failed to include specific restrictions on social interaction in the residual functional capacity assessment, but argues that any error was harmless as the plaintiff could still perform the job of hand packager as it does not involve significant interaction with the public.  This court disagrees that such error is harmless as clearly the ALJ did not include all of the plaintiff's impairments in the hypothetical question to the vocational expert.  The plaintiff's social phobias and panic attacks are well documented in the record.  "[I]n order for a vocational expert's opinion to

20

be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). Accordingly, upon remand, the ALJ should be instructed to reconsider the plaintiff's residual functional capacity and to include all of the plaintiff's impairments in a hypothetical to the vocational expert.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

June 2, 2009

Greenville, South Carolina